## UNITED STATES ex rel. KROGER GROCERY & BAKING CO. v. INTERSTATE COMMERCE COMMISSION.

### No. 6195.

United States Court of Appeals for the District of Columbia.

Argued Oct. 1, 1934.

Decided Nov. 5, 1934.

Harry Friedman, of Washington, D. C., and Samuel V. Markley, of Georgetown, Ohio, for appellant.

Nelson Thomas, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

This is an appeal from an order of the District Supreme Court dismissing a petition for mandamus to compel the Interstate Commerce Commission to fix the amount of damage sustained by petitioner, by reason of the collection of illegal charges on shipments of ordinary live stock in carload lots, and to order reparation made therefor.

Petitioner is a consignee of live stock in carload lots with destination at Cincinnati, Ohio. Together with other operators of meat-packing concerns in Cincinnati, it filed a complaint with the Commission against the railroads and the Cincinnati Union Stock Yards Company, alleging that certain yardage charges collected at Cincinnati were in violation of section 6 and section 15 (5) of the Interstate Commerce Act, as amended (49 US CA §§ 6, 15 (5). The cases were consolidated, heard, and decided by the Commission in the proceedings entitled "E. Kahn's Sons Co. v. B. & O. R. R. Co. et al., 192 I. C. C. 705." The Commission dismissed the complaints.

The record in this court does not contain a copy of the complaints, nor the evidence submitted to the Commission. Upon the filing of the petition for mandamus in the District Supreme Court, the Commission answered, to which petitioner filed a demurrer. On hearing before Chief Judge Wheat, the demurrer was overruled, and petitioner electing to stand upon the demurrer, there was final judgment, from which an appeal was taken to this court. The facts, as we find them in the petition for mandamus and in the report and answer of the Commission, are as follows:

Tariff I. C. C. No. W. L. 9881 of the carriers provides that the Cincinnati Union Stock Yards, a public stock yard located within the Cincinnati switching district, should be the regular station for the handling of live stock at that point. The stock yards company is a noncarrier corporation, whose business consists of feeding, watering, yarding, weighing, handling, and caring for live stock. It is equipped with what are termed unloading pens, into which the cattle are driven over a platform, through chutes, from the railroad cars which are placed on adjacent tracks. These unloading pens have an area of 688 square feet, twice that of a 40-foot car. Only a few of these pens have facilities for watering, none have facilities for feeding live stock.

The stock yards also maintains pens of a different character which are designated holding pens, where stock is held to suit the convenience of the consignee. The latter are equipped with facilities for watering and feeding. Most of the live stock comprising petitioner's shipments were, after being taken from cars into the unloading pens, driven to scales, where the animals were hoof-weighed, and thence driven into the holding pens. Shipments remain in these holding pens sometimes for several hours, occasionally overnight and during holidays, and until desired by consignees. Some consignees take their stock directly from the unloading pens, passing through alleyways and chutes from the stock yards. In such cases no charge for stock yard services is made by the stock yards company, the shipper or consignee paying only the transportation charge. The stock yards company files no tariff with the Interstate Commerce Commission, but does file a tariff with the Secretary of Agriculture pursuant to the terms of the Packers and Stockyards Act (42 Stat. 159). These tariff charges cover services rendered by the stock yards company in driving live stock from the unloading pens to the holding pens, weighing, issuing certificates of weight, watering, and keeping the live stock in the holding pens for such time as may be desired by the consignees. There is no extra charge for detention in the holding pens, except for feed consumed. The stock yards company is under contract to the railroads to unload live stock into the unloading pens, and to keep a record thereof and to notify consignees of arrival, and to make delivery and receive the transportation charges.

Petitioner's position here is that under the applicable tariff on file with the Commission the transportation of its live stock did not end until it was weighed and delivered at destination, and the particular tariff provision on which it relies is rule 16 (b) (included in a manual for the use of agents and for the information of shippers), providing that if proper facilities are furnished at destina-

tion for obtaining hoof weights, the weights so obtained will be the proper basis for assessing freight charges. In other words, its position is that the determination of the weight in the precise manner provided under (b) was a necessary element of the freight charge and was part of the transportation service for which no extra charge could be exacted by the carrier or by its agent, the stock yards company. The issue thus raised was decided adversely to petitioner by the commission, which in its report said:

"Complainants believe that under certain provisions of the tariff before mentioned their shipments must be hoof-weighed at destination before delivery can be made, and that this weighing is part of the transportation service for which no additional charge can be made. Defendants' position is that it is optional with the consignees whether they desire the freight charges based on the hoof weights obtained at destination or the track-scale weights of the cars, and that it is mandatory to base freight charges on the hoof weights only in instances where that information is obtained, it being of no concern to them whether the stockyard company or the consignee bears the cost of the weighing.

"Rule 16 (b) of the tariff declares that 'Where proper facilities are provided at destination for obtaining hoof weights, the weights so obtained after the stock has been fed and watered, will be the proper basis for assessing freight charges', subject to certain enumerated fill allowances; and that 'If the stock has not been fed and watered, destination hoof weight will be used without deduction for fill.' This tariff does not expressly declare that the stock shall be hoof weighed at destination. Moreover, to sustain complainants' interpretation would render meaningless paragraph (e), which provides in effect that all weights furnished at Cincinnati will be subject to verification by the carriers. In additional support of the view that this tariff provides merely an alternative method of determining the freight charges, defendants refer to paragraph (f) wherein it is stated that where arrangements are not made at destination for the use of hoof weights, or where shipments move between stations (not markets) upon which actual weights are not obtainable, then the track-scale weights of cars loaded and empty will be used to determine the freight charges. Paragraph (h) specifies that when weights under the foregoing rules cannot be obtained at origin or destination the shipment will be subject to paragraph (a) which provides that in no case will charges be collected on less than the established carload minimum weight. Consideration of the various provisions of defendants' tariff relative to weighing leads to the conclusion that their contention should be sustained."

Petitioner contests this interpretation of the tariff. It insists that (b), which is to be found in the above-quoted part of the report of the Commission, makes it *mandatory* to apply hoof weight for assessing freight charges wherever proper facilities are provided at destination for obtaining such weights, and it likewise insists that such facilities were available in the stock yards of the carriers' agent at Cincinnati. From this premise it argues that the rule obtaining at Cincinnati, whereby petitioner was required to pay this charge to the stock yards company, was a violation of the Commerce Act. In order to put itself outside the rule that mandamus will not lie to correct an error of law or fact in the construction of a tariff by the Commission (Interstate Commerce Commission v. U. S. ex rel. Campbell, 289 U. S. 385, 393, 394, 53 S. Ct. 607, 77 L. Ed. 1273), it insists that the commission did not take jurisdiction of the subject-matter and decide some question with respect thereto, but on the contrary took jurisdiction of the complaint and decided that the charge for hoof-weighing was not part of the interstate transportation and was therefore not subject to its jurisdiction. In other words, that the Commission concluded that the subject-matter of the controversy was not covered by the provisions of the act; that the effect of this is a denial by the Commission of jurisdiction, and that in such a case it is the duty of the court to direct the Commission by mandamus to entertain jurisdiction and to adjudicate the controversy. United States ex rel. Louisville Cement Co. v. Commission, 246 U. S. 638, 644, 645, 38 S. Ct. 408, 62 L. Ed. 914. On behalf of the Commission it is insisted that it did take jurisdiction of the complaint and did afford a hearing; that it decided the issues of fact and denied relief because of a conclusion that under the act it could not legally require the repayment of money exacted by a stock yards company for yardage services.

■■ From this summary of the opposing contentions it will be apparent at once that petitioner's position is based upon the theory that in refusing reparations the Commission misconstrued the plain mandate of the statute, and hence its action in dismissing the complaint amounted to a refusal to act and,

likewise, to a disclaimer of jurisdiction. In support of its position it relies on Interstate Commerce Commission v. U. S. ex rel. Humboldt S. S. Co., 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849. In that case the Supreme Court discusses the circumstances under which the writ of mandamus will issue and announces the familiar rule that it may be issued to direct the performance of a ministerial act, but not to control discretion. At page 484 of 224 U. S., 32 S. Ct. 556, 559, Justice McKenna, speaking for the court, says: "But if it [the Commission] absolutely refuse to act, deny its power, from a misunderstanding of the law, it cannot be said to exercise discretion." We have, therefore, recourse to the statute to determine whether or not, giving full effect to this language of the Supreme Court, the Commission in this case did refuse to act or did deny its jurisdiction. The sections of the act on which petitioner relies are 6 and 15 (5). The first of these sections requires carriers to publish tariff schedules covering all charges for transportation, forbids rendition of transportation services as defined in the section without such publication of charges therefor, and further forbids the charging of a different compensation for transportation than as prescribed in the tariffs published. The other section provides that the transportation by railroad of ordinary live stock, in carload lots, destined to or received at public stock yards, shall include delivery at public stock yards into suitable pens without extra charge to the shipper, consignee, or owner, for such service.

The published tariff, to which we have already referred, fixes the rate of transportation on the weight basis of the shipment and, in rule 16, to which we have referred, provides a number of different methods to meet different situations in determining the weight. Petitioner, as we have said, insists that subsection (b) is mandatory in the case of shipments destined to Cincinnati and tells us that its language is so plain that it requires no judicial construction and admits of no discretion, and that therefore the act of the Commission in holding it not to apply is such a misunderstanding of the law as to amount to a denial of its power and jurisdiction; but we think this contention cannot be sustained. On the contrary, we think the interpretation of the language of the tariff involves necessarily an appreciation of the incidents ordinarily affecting its use, and in that field the Commission is supreme. Undoubtedly, as was said in Covington Stock-Yards Co. v. Keith, 139 U. S. 128, 11 S. Ct.

461, 35 L. Ed. 73, a carrier of live stock has no more right to make a special charge for delivering the stock in and through stock yards provided by itself, or provided by another corporation, than a passenger carrier has to make a special charge against a passenger for the use of its passenger depot. The duty of the carrier begins with the delivery of the stock to the carrier to be loaded on its cars, and ends only after the stock is unloaded and delivered or offered to be delivered to the consignee, and the precise terms of the statute (section 15 (5)) impose upon it the obligation to place the stock in suitable pens without extra charge to the consignee. These duties, we think, involve also the duty to furnish all necessary service incident to the carriage, including the ascertainment in some way of the accurate weight of the shipment, since the basis of the transportation charge is the weight of the cattle. But there is nothing in the act itself, and nothing in the published tariff—certainly nothing which may be said to be beyond dispute—which, as we think, makes it the duty of the railroad company to ascertain the weight of the shipment in any particular manner. It is sufficient if a method is adopted which fairly and accurately determines that fact. We are, therefore, of opinion that there is quite enough in the tariff to sustain the conclusion of the Commission, viz., that (b) of rule 16 is not exclusive and is not mandatory. The precise language is: "Where proper facilities are provided at destination for obtaining hoof weights, the weights so obtained * * * will be the proper basis for assessing freight charges * * *." Subsection (f) of the same rule provides: "Where arrangements are not made at destination for the use of certified hoof selling weights as a basis for determining freight charges, * * *. The track scale weights of cars loaded and empty will be used to determine freight charges * * *." The necessary conclusion from the report of the Commission is that the carriers have not provided facilities for obtaining hoof weights at Cincinnati; that their contract with the stock yards company is to receive the cattle, unload them, deliver them into pens, notify the consignee, and in turn deliver them to the consignee; and that the other services which it renders, that is to say, hoof-weighing and retention when desired, are stock yard services with which the carriers are not concerned. Based on this conclusion, the Commission reports that the method last above mentioned (f) was available to the consignee, and that under its pro-

visions freight charges could be accurately determined and the cattle delivered to the consignee from the unloading pens without extra charge or cost to it. This interpretation finds support in the fact that in the case of other consignees of live stock at Cincinnati, whose relation to the subject-matter was in all respects identical with that of petitioner, delivery of live stock was accomplished precisely in the above-stated manner.

██ It is clear, therefore, that if petitioner had elected to accept its cattle from the unloading pens, which in this controversy the Commission has found to be suitable for that purpose, the track-scale weights to ascertain the transportation cost would have been adopted and delivery would have been made in accordance with the provisions of the act and of the tariff, and this the Commission has determined is all that the act requires. We have here, therefore, a case in which the Commission has given petitioner and other consignees of live stock at Cincinnati a full hearing and has decided that the statute requiring the furnishing of suitable pens was complied with—a finding of fact by which, of course, we are bound—and likewise has decided that, in the conditions existing in Cincinnati, subsection (b) of Rule 16 is not exclusive or mandatory, but that an optional method of ascertaining transportation charges is provided by the same rule, which permits delivery of the cattle without the imposition of stock-yard charges. From this it is clear that the Commission construed the tariff on which petitioner relies as the basis of its claim of overcharge, and denied the claim. This was neither a refusal to act, nor a denial of jurisdiction. And whether we agree or disagree with the conclusion is beside the question, for in such a case it is obvious mandamus is not the appropriate remedy to obtain a review. From this it follows that the order of the lower court was in all respects correct.

Affirmed.