**ARMOUR & CO. v. ALTON R. CO. et al.**

No. 7030.

Circuit Court of Appeals, Seventh Circuit.

April 4, 1940.

As Modified on Denial of Rehearing.

May 21, 1940.

Charles J. Faulkner, Jr., W. C. Kirk, and Paul E. Blanchard, all of Chicago, Ill., for appellant.

Meyer Morton, Elmer W. Freytag, Bryce L. Hamilton, Frank H. Towner, Kenneth F. Burgess, Douglas F. Smith, D. Robt. Thomas, Jr., and James F. Oates, Jr., all of Chicago, Ill. (Sidley, McPherson, Austin & Burgess, of Chicago, Ill., of counsel), for appellees.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing a complaint filed by Armour and Company, an Illinois corporation, engaged in the purchase and slaughter of livestock. 27 F.Supp. 625. Armour commenced this suit in the Circuit Court of Cook County against the Alton Railroad and various other railroad companies, hereafter also referred to as the "carriers." On July 14, 1938, the suit was removed to the Federal Court and therein filed on July 29, 1938. The defendant carriers moved to dismiss the complaint, the District Court entered a judgment of dismissal, and Armour appealed to this Court.[1]

Armour and Company operates a packing plant adjacent to the public stockyards which are located at 39th Street and Racine Avenue, Chicago. These yards (constructed in 1865) are owned and operated by the Union Stock Yard and Transit Company of Chicago, hereafter referred to as the "Yards Company." Armour buys livestock in Illinois and other states, ships by rail to itself at Union Stock Yards, Illinois (the railroad station named in the tariffs), and pays the line-haul rate speci-

---

[1] Some of the carriers are or were in the process of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205, 11 U.S.C.A. § 205 and are or were represented by receivers or trustees. These defendants moved to dismiss on the additional ground that Armour failed to obtain the consent of the Bankruptcy Courts to bring this suit against them.

In general the corporate defendants moved to dismiss on two grounds: (1).

The complaint raised questions involving the exercise of administrative discretion, and hence the Abilene doctrine was applicable, Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S. Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; (2). Armour failed to join the Union Stock Yard and Transit Company of Chicago, a corporation, as party defendant.

fied therein. Livestock consigned to this station is delivered by the defendant carriers at their common livestock depot, the yards of the Yards Company.

Prior to 1865 livestock shipped to Chicago packers was delivered by the various carriers at different places in the city. These places were not equipped with facilities for delivering livestock in any great quantity. After 1865, by the common action of the carriers and by arrangement with the Yards Company, the yards of this company became the usual place in Chicago at which livestock was delivered. Down through the years these yards continued to be the common livestock depot of all the carriers, and delivery was ordinarily made there. In expressing the same thought the Supreme Court described the yards as the "terminals of the line-haul carriers." Adams v. Mills, 286 U.S. 397, 409, 52 S.Ct. 589, 76 L.Ed. 1184. See also Interstate Commerce Commission v. C. B. and Q. R. R. Co., 186 U.S. 320, 22 S.Ct. 824, 46 L. Ed. 1182.

■ Thus it came to pass that these yards—providing such facilities as loading and unloading platforms, chutes and alleys, unloading and holding pens, and other livestock conveniences—became the common livestock depot of the defendant carriers. The Yards Company in supplying its yards, performs there the transportation services which the carriers are under a duty to render. Serving in this capacity it is the agent of the carriers and a common carrier subject to the Interstate Commerce Act. 24 Stat. 379, as amended in 1920, 41 Stat. 474, 49 U.S.C. Secs. 1–27, 49 U.S.C.A. §§ 1–27; United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 33 S.Ct. 83, 57 L. Ed. 226; Union Stock Yard & Transit Co. v. United States, 308 U.S. 213, 60 S.Ct. 193, 84 L.Ed. ——. That it is proper for the carriers to discharge their duty to deliver at the place of destination, in this way, is clear. Merchants' Warehouse Co. v. United States, 283 U.S. 501, 506, 51 S.Ct. 505, 75 L.Ed. 1227.

■ At the yards employees of the Yards Company unload the livestock into unloading pens located upon the company's property. For this service the company charges the carriers a certain rate which is filed with the Interstate Commerce Commission. Since this service is a rail transportation service, rendered by the carriers (through their agent, the Yards Company) for the shipper, the charge therefor is covered by the line-haul rate. Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184. On the other hand, in addition to and separate from the rendition of rail transportation services, the Yards Company also performs specified stockyard services such as holding, feeding and storing. In rendering such a special service the company is subject to the Packers and Stockyards Act, and for such services charges the packer a certain rate which is filed with the Secretary of Agriculture. 42 Stat. 159, 7 U.S.C. Secs. 181 et seq., 201(b), 226, 7 U.S.C.A. §§ 181 et seq., 201(b), 226.

■ It might be said that in the rendition of a transportation service the Yards Company acts as agent of the carriers, but that in the performance of a stockyard service it acts as agent of the packer. Adams v. Mills, supra; Union Stock Yard & Transit Co. v. United States, supra; Burton v. Wabash Ry. Co., 332 Mo. 268; 58 S.W.2d 443, 447. It has also been said that "Stockyard services do not commence until unloading ends; they end when loading begins." Denver Stock Yards v. United States, 304 U.S. 470, 477, 58 S.Ct. 990, 82 L. Ed. 1469. See also Burton case, supra.

For many years the Yards Company has collected a specified "yardage" fee for all livestock received in the yards, and this charge has been filed with the Secretary of Agriculture. From the complaint and the exhibits attached thereto, it appears that the yardage fee is a per capita charge on all livestock received at the yards. But it does not appear what the exact nature of the service is, for which the charge is assessed. Plaintiff reasons that the charge is necessarily imposed on the privilege of removing the livestock from the unloading pens. Defendants leave the impression that the charge is levied for the rendition of a stockyard service.[2] In any event, until

---

[2] Armour alleges that after May 25, 1933 it did not use extra facilities or special yard conveniences, and that therefore the imposition of the yardage charge was necessarily made for removing the livestock from the unloading pens. As such, it would appear that the charge is for a transportation service.

An attached exhibit (Reply of Union Stockyards Co. to Armour and Company) indicates that the charge is for the use of the yards, and that it is filed with the proper administrative authorities. As such, it would appear that the charge is for a stockyards service.

May 25, 1933, Armour paid this yardage charge without complaint.

█ In passing we add that the transportation of livestock by rail begins with its delivery to the carrier for loading at point of origin, and ends after unloading for delivery or tender to the consignee at the place of destination.[3] This was the rule at the common law. Covington Stock Yards Co. v. Keith, 139 U.S. 128, 136, 11 S.Ct. 461, 35 L.Ed. 73. It is the rule under the Interstate Commerce Act. See Union

---

It is certain that the collection of the yardage charge, made in connection with the use of the yards in effecting delivery of livestock, is a "long existing practice" whose roots lie buried in the history of the stockyards and their use as a common livestock depot of the carriers. Atchison, T. & S. F. R. Co. v. United States, 295 U.S. 193, 199, 55 S.Ct. 748, 79 L.Ed. 1382. This charge is applied to all livestock received at the yards. Nor has it been material in the past whether the animals were taken by the consignee immediately from the unloading pens, or from there transferred to holding pens and later taken by the consignee. Atchison Ry. case, supra, 295 U.S. at page 196, 55 S.Ct. at page 748, 79 L.Ed. 1382.

History also tells another story, a story of shipper complaint of practices and abuses indulged in by carriers and Yards Company to the end that terminal charges be added to scheduled carrier rates. See dissent in Atchison Ry. case, supra, 295 U.S. at pages 206-207, 55 S.Ct. at page 748, 79 L.Ed. 1382. See also footnote 3.

3 The practice at the Chicago yards, for over fifty years, had been to unload livestock in unloading pens without charge to the consignee. Adams v. Mills, 286 U.S. 397, 410, 52 S.Ct. 589, 76 L.Ed. 1184. This, however, was not the practice prior to 1920 in other public stockyards, Atchison, Topeka & Santa Fe Ry. Co. v. United States, 295 U.S. 193, 198, 55 S.Ct. 748, 79 L.Ed. 1382. Section 15 (5) of the Interstate Commerce Act, enacted in 1920, made the Chicago practice general throughout the United States. 41 Stat. 486, 49 U.S.C. Sec. 15 (5), 49 U.S.C.A. § 15(5).

Section 15 (5) provides that at public stockyards transportation shall include delivery of inbound shipments into "suitable pens" without extra charge to the consignee. In 1932 the Supreme Court in Adams v. Mills, supra, declared that the transportation of livestock to the Chicago public stockyards shall include unloading without extra charge, at the same time leaving undisturbed the Yards Company's practice of making the yardage charge on all livestock received therein, Atchison Ry. case, supra, 295 U.S. at page 199, 55 S.Ct. at page 748, 79 L.Ed. 1382.

In the meantime, however, the packers had begun to contest the legality of the yardage charges before the Interstate Commerce Commission, and this case became known as the Hygrade or Atchison Ry. case. The Commission found that no services were rendered after unloading for which the carriers and the Yards Company may assess charges, in instances where delivery is taken at the unloading pens within a reasonable time. Hygrade Food Products Co. v. Atchison, T. & S. F. R. Co., 195 I.C.C. 533. On the other hand, the Commission concluded that the yardage charge upon livestock transferred to holding pens was proper.

However, the Commission's order directing discontinuance of the yardage fee in instances where delivery was taken at the unloading pens, was set aside. Hygrade case, supra, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382. The Court was impressed by the consignee's constant use of certain property of the Yards Company, namely, "A route via the overhead runway to the Hygrade plant," and concluded that there was no evidence that in removing the animals from the unloading pens, the consignee used only an egress to the city streets. However, the Court recognized that "Plainly there is an essential difference between the route from the unloading pens to consignee's plant and a mere way out to the public highways."

In this connection, it is material to quote briefly: "The Hygrade Company did not seek and the Commission did not grant relief upon the ground that the carriers failed to provide egress from the unloading pens in the public stockyards [at Chicago] to the city streets by means of which consignee's animals might be removed to its plant. * * * Consignee * * * sought free use of the Yards Company's properties, including the overhead runway * * *." Atchison Ry. case, supra, 295 U.S. at page 200, 55 S. Ct. at page 752, 79 L.Ed. 1382. It is to be noted that in the instant case plaintiff has borne these words in mind.

In a recent opinion the Supreme Court said of the Atchison or Hygrade decision that "There the Commission's order * * * was set aside on the sole ground that the Commission's findings failed to show that the service for which the charge was made was any part of the loading or unloading services, or otherwise a service which the rail carrier was bound to furnish." Union Stock Yard & Transit Co. v. United States, 308 U.S. 213, 60 S.Ct. 193, 196, 84 L.Ed. ——.

Stock Yard & Transit Co. v. United States, supra. No magic is needed to compel the thought that the mere privilege of immediate removal from the unloading pens, "a mere way out to the public highways," is incidental to and part of the delivery. Atchison, Topeka & Santa Fe Railway Co. v. United States, 295 U.S. 193, 201, 55 S.Ct. 748, 79 L.Ed. 1382; See also dissent therein, 295 U.S. at page 203, 55 S.Ct. at page 753, 79 L.Ed. 1382.

On May 9, 1933, Armour notified the carriers and their agent, the Yards Company, that after May 25, it would accept delivery at the unloading pens and remove the unloaded livestock within a reasonable time thereafter, but would not pay the yardage fee. On May 10 the Yards Company answered that it would insist on the payment as long as the yards were used as the livestock terminal of the carriers. On May 16, Armour notified the carriers of this answer, but collection of the charge continued. However, after May 25, 1933, Armour paid the charge under protest and later instituted the instant case.

*Nature of Consignee's Action.* In the instant case Armour is not complaining that the line-haul rate is unreasonable, nor for that matter that the yardage charge is unreasonable. In the last analysis of things, it is plain that Armour's claim is based on the theory that the yardage charge is levied on a service, compensation for which is already included in the line-haul rate. We know that as consignee of livestock shipments, plaintiff is entitled to possession of the animals upon the payment of the lawful charges. Therefore, if indeed the carriers through their corporate agent have exacted an unlawful charge, then the exaction is a tort.

In general Armour alleges that the duty to deliver includes access to and from the unloading pens for the immediate removal of the cattle; this duty was breached. In particular Armour alleges that the yardage charge was imposed in addition to the scheduled tariff rate for the bare privilege of removal: such a charge is unlawful. See f.n. 2 also. In this light the suit here is one for damages occasioned by an alleged overcharge, the amount of which equals the yardage charges collected. See Adams v. Mills, supra; Atchison Ry. case, supra; United States v. I. C. C., 64 App.D.C. 43, 73 F.2d 948.

Armour contends that the complaint in question states a cause of action for damages occasioned by improper delivery. From this Armour reasons that the cause of action is not based upon any violation of the Interstate Commerce Act, and hence the Interstate Commerce Commission is without jurisdiction. We cannot agree with Armour's major premise. In the paragraphs above, regard was given to the substance of the transactions alleged in the complaint. For example, it is obvious that the instant case is not a mere "loss and damage" suit. It is not necessary to say more, except that the question at all times is one not of form but of actuality.

■ In substance the complaint states a claim based on over-charge, plainly a violation of the statute. Section 6(7) reads as follows: " * * * nor shall any carrier charge or * * * collect * * * a greater * * * compensation for such transportation of * * * property, or for any service in connection therewith, between the points named in such tariffs than the rates * * * specified [therein] * * *." Ordinarily the Courts and the Commission have concurrent jurisdiction over claims based on overcharge; therefore the difference of opinion between Armour and us as to the nature of the cause of action alleged, does not necessarily dispose of the case adverse to Armour's interest. Southern R. Co. v. Eichler, 8 Cir., 56 F.2d 1010; Barrett v. Gimbel Bros., 3 Cir., 226 F. 623, 631; Kansas City So. Ry. v. Wolf, 8 Cir., 272 F. 681.

*Primary Jurisdiction Doctrine.* The carriers moved to dismiss chiefly on the ground that the complaint raised administrative problems and hence was subject to the primary jurisdiction of the administrative bodies. Armour contends that the complaint raised strict legal issues and hence the case was subject to the exclusive jurisdiction of the courts.

■ Some situations require prior administrative adjudication; other situations permit original resort to the courts. It is said the answer depends upon "the character of the controverted question and the nature of the enquiry necessary for its solution." Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943. The Supreme Court has pointed out the line of demarcation many times: the line lies between controversies which involve issues of law and those which involve issues essentially of fact or call for the exercise of administrative discretion. See Great North-

ern Ry. case, supra, 259 U.S. at page 295, 42 S.Ct. at page 477, 66 L.Ed. 943. But the Abilene doctrine, the doctrine of primary jurisdiction, is still more easily stated than applied. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075.

Our great Chicago stockyards go back to 1865 for their origin, and soon thereafter the line-haul carriers began to use these yards as their common livestock depot. And at the same time there came into existence the tri-party relationship between carriers, shippers and Yards Company. That relation continued through the years but not without many disturbing conflicts, as the opinions of the Supreme Court graphically point out. This picture in perspective has been drawn for us, and it paints a story of shipper complaint of practices at the yards, some to the end that forbidden charges be imposed for carrier service. The story told, brings into bold relief the instant controversy between shipper and line-haul carriers and identifies it as its most recent chapter.

In this case the "character of the controverted question" is plain enough. The controversy involves a quarrel between carriers and customer, wherein the customer condemns as unlawful the yardage charge, for many years levied by the carriers in addition to the line-haul charge. Armour claims that the yardage charge is imposed upon a mere incidental terminal service, compensation for which is already included in the line-haul rate. The carriers insist that the charge is levied on a non-transportation or special yard service, or on a carrier service compensation for which is not properly included in the line-haul rate. And history indicates that it is peculiar to the yards in question, a charge growing out of the practice of the carriers and the Yards Company by which the yards were made the common depot for the delivery of livestock consigned to Union Stock Yards, Illinois. See footnotes 2 and 3.

To solve this controversy it is necessary to determine what in actuality the service is that is being rendered, whether it is one which the rail carriers are bound to furnish, and whether it is already included in the line-haul rate. The inquiry necessarily compels recourse to certain facts, such as the history of the Chicago stockyards; the use of these yards as the carriers' usual place of delivery; the history of the yardage charge; the tri-party relation; and many other intricate facts of transportation incidental to rate-making.

■ Counsel for Armour finds comfort in the proposition that delivery at the place of destination includes a "mere way out to the public highways." The complaint alleges that no special yard services were requested, so he infers that whatever service is covered by the yardage charge is included in transportation. Then he concludes that as a matter of law the charge is included within the line-haul rate. We are not inclined to disagree with his proposition of law, but we fail to appreciate his inference and conclusion. As shown in the paragraph above, we are concerned here with questions that compel inquiry into the history, usages and actual conditions of operation at the stockyards. Our conclusion is that this case presents a controversy whose solution necessitates the exercise of administrative discretion, and therefore prior administrative resort is imperative.

That this case raises administrative problems, finds adequate support in such cases as Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184; Atchison, T. & S. F. R. Co. v. U. S., 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382; St. Louis I. M. & S. R. Co. v. J. F. Hasty & Sons, 255 U.S. 252, 41 S. Ct. 269, 65 L.Ed. 614; Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319, and Aron v. Pennsylvania R. Co., 2 Cir., 80 F.2d 100, 103 A.L.R. 1367, certiorari denied 298 U.S. 658, 56 S.Ct. 680, 80 L.Ed. 1384. In the Atchison Ry. case, 295 U.S. 193, 195, 199, 55 S.Ct. 748, 79 L.Ed. 1382, the Supreme Court described the collection of the yardage charge as a "long existing practice," and stated the case to be whether "the practice of the carriers and Yards Company in making the stockyards their depot for delivery of livestock pursuant to an arrangement by which the Yards Company imposes a yardage charge is an unjust and unreasonable practice." Further discussion will add little to what has already been said.

■ *Stay Pending Administrative Determination.* In a supplemental brief Armour also argues that if an administrative question was involved, the Trial Court should have suspended its consideration of the case, until after it had referred the question to the proper administrative bodies and they had properly passed upon it. Counsel relies on a recent opinion by the Supreme Court, where it was stated that

"When it appeared in the course of the litigation that an administrative problem * * * was involved, the court should have stayed its hand * * *. There should not be a dismissal, but * * * the cause should be held pending the conclusion of an appropriate administrative proceeding." General American Tank Car Corp. v. El Dorado Term. Co., 308 U.S. 422, 60 S. Ct. 325, 331, 84 L.Ed. ——.

In the El Dorado Terminal case, supra, the Supreme Court points for precedence to Mitchell Coal Co. v. Pennsylvania R. R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472. In the Mitchell case the primary jurisdiction point was not raised until some time after trial had started. The Court there said, 230 U.S. at page 266, 33 S.Ct. at page 924, 57 L.Ed. 1472: "But, owing to the peculiar facts of this case, the unsettled state of the law at the time the suit was begun, and the failure of the defendant to make the jurisdictional point in limine, so that the plaintiff could then have presented its claim to the Commission * * * direction is given that the dismissal be stayed." In the El Dorado Terminal case the primary jurisdiction point was not raised until after the trial on the merits.

In the instant case the primary jurisdiction point was urged in limine. Therefore, the reasons for staying the dismissal do not exist, and it cannot be said on the strength of the El Dorado Terminal case that the Trial Court erred in failing to hold this case pending administrative reference and adjudication. We conclude, therefore, that the circumstances here do not require an application of the stay rule as announced recently in the El Dorado Terminal case.

In the supplemental brief counsel for Armour also argues that the administrative finding in the Hygrade case, 195 I. C.C. 553, is a substitute for the prior administrative adjudication which we conclude is necessary in this case, and hence direct recourse may be had to the courts without again referring the same question to the Commission. It is true that the Hygrade case involved the same problem, and that ordinarily this argument would be cogent. Unfortunately, we cannot entertain the argument advanced, for it is history that the Hygrade finding was reversed. Atchison Ry. case, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382. See also Union Stock Yard & Transit Co. v. U. S., 308 U.S. 213, 60 S.Ct. 193, 84 L.Ed. ——, for a restatement of the Hygrade decision.

Our conclusion that the primary jurisdiction doctrine of the Abilene case is applicable here, makes it unnecessary to rule on other matters raised on the appeal. See f.n. 1. The order of the District Court is affirmed. It is so ordered.

### On Petition for Rehearing.

Armour's complaint and argument too was based on the theory that the particular yardage charge (imposed by the defendant railroads through their agent Yards Company) is levied on the bare privilege of removing the livestock from the unloading pens, a service already compensated for in the line-haul rate. The complaint and attached exhibits indicated that the livestock was consigned for delivery at Union Stock Yards, Illinois. Livestock consigned to this station is delivered by the defendant railroads at their common livestock depot (the public stock yards of the Yards Company) unless the consignee specifies delivery on industry tracks serving his plant or on team tracks of the individual railroads.

This court concluded that the District Court did not err in dismissing the complaint in question: it raised administrative problems and hence was subject to the primary jurisdiction of the administrative bodies. Since our decision the Interstate Commerce Commission has adjudicated the administrative problems against Armour, i. e., it has found that the transportation of livestock consigned for delivery at this common livestock depot ends at the unloading pens and that hence the carriers' failure to afford free egress is not an unreasonable practice.

In the course of the administrative opinion the Commission defined three possible factual situations involving the shipment of livestock: (1) Chicago shippers may consign livestock to themselves at the Union Stock Yards station, and if delivery is not requested as in (2) below, then delivery is at the public yards of the Yards Company. As to this situation the administrative finding is as stated in the preceding paragraph. (2) Chicago shippers may consign livestock to themselves at the Union Stock Yards station and specify delivery at team tracks or at industry tracks. As to team track delivery the consignee does his own unloading. As to industry track delivery he pays an additional switching charge. (3) Shippers may consign livestock to a station other than a public stock yard. As to this situation

transportation does not end at the unloading pens and includes free egress therefrom to the public streets.

In this petition Armour contends that its case falls either in situation (2) or situation (3) and therefore our decision should be reversed. There is no merit in this contention. The complaint and exhibits are plain that Armour's case falls within the confines of situation (1) and the adverse administrative adjudication, unless disturbed in proper course, stands in Armour's way. In fact, to give heed to the contention here is tantamount to our giving Armour permission to alter or modify the true character of the complaint. This we can not do.

Plaintiff has asked leave to file an additional memorandum. Leave is granted. The memorandum has been considered. The petition for rehearing is denied.

In view of the position we have taken, there is also denied the motion for an order remanding the cause to the lower court for trial and the motion for a supplemental opinion. It is so ordered.

