**LOUISVILLE & N. R. CO. v. UNITED STATES.**

**Civ. A. No. 2045.**

United States District Court
W. D. Kentucky.

July 30, 1952.

H. T. Lively, of Louisville, Ky., for Louisville & N. R. Co.

Morton Liftin, Washington, D. C., Charles F. Wood, Asst. U. S. Atty., Louisville, Ky., for the United States.

MARTIN, Circuit Judge (sitting by designation).

## Opinion

The defendant, United States of America, has filed and submitted on brief and argument a motion to dismiss this action for lack of jurisdiction, for the alleged reasons that (1) the amount sued for exceeds $10,000, and (2) the Interstate Commerce Commission has jurisdiction in the cause, which was brought in the United States District Court under the asserted authority of the Tucker Act, 28 U.S.C. §§ 1346, 2401(a), and 2402, approved June 25, 1948, effective September 1, 1948, and under Rule 18(a), Federal Rules of Civil Procedure, 28 U.S.C.

Though the complaint was filed by the plaintiff on January 10, 1951, the motion to dismiss was not filed until July 14, 1952, (ten days after all the evidence in the case had been received in a two days' trial), and was argued simultaneously with the oral arguments upon the merits which were heard by special setting for a full day upon the last-mentioned date. The delay in presentation of the motion to dismiss is no bar to its consideration, for, as is well known, a question of jurisdiction may be raised at any time, even in the Supreme Court *sua sponte*. But such delay does evince less confidence, in the mind of the movant, in the validity of the motion than if it had been promptly filed. Nevertheless, counsel for

the Government is commended for directing the attention of the trial judge to the question of jurisdiction, which is, at least, a debatable issue in this case.

█ (1) In support of his first ground, the Government's astute attorney points to Sutcliffe Storage & Warehouse Co. v. United States, 1 Cir., 162 F.2d 849, 852, in which the Court of Appeals held that the District Court lacked jurisdiction in an action under the Tucker Act where the plaintiff had joined four actions, each for less than $10,000, in the same suit; the total amount sued for being in excess of $10,000. Each of the causes of action was for compensation for the use of the same real estate over different time periods. The Court said: "Ordinarily there is no reason why a plaintiff cannot make all his claims on a running account at one time without piecemeal presentation. The fact that here involved are questions of federal jurisdiction is not a sufficient basis for departing from these usual rules as to the splitting of legal claims. The congressional policy is that all large claims must be presented in the one court in Washington, and in every practical sense there is here presented such a claim. Even though the plaintiff's own convenience might be served by adjudication in its vicinage, the congressional policy seems clearly opposed.

"Nor can we see basis for varying the rule on the grounds urged by the plaintiff. There is no reason why the doctrine against splitting claims, which is thus only one application of the general doctrine of res judicata, should not apply to claims against the Government; and the cases so hold. (Citing cases). The case of Oliver v. United States, 9 Cir., 149 F.2d 727, relied on by the plaintiff, asserts no doctrine to the contrary. There the court held merely that in the case of separate and distinct claims for income tax payments due under differing years the fact of joinder in one action did not violate the jurisdictional restriction against claims in excess of $10,000 each. At least under the new rules, allowing joinder of widely diverse claims, the fact that such claims appear in the same civil action and that their total may exceed $10,000 does not change their separate identity or make

them a single 'cause.' The court definitely assumed the existence of a separate claim for federal income taxes for each year involved. Compare also Industrial Commissioner of the State of New York v. Schneider, 2 Cir., 162 F.2d 847; United States v. Sullivan, 2 Cir., 98 F.2d 79. Thus the court started with the basic premise which is the subject of dispute in our case, namely, whether there is more than a single claim involved." 162 F.2d 852.

In the Oliver case, supra, the Court of Appeals for the Ninth Circuit reversed the order of the District Court dismissing the claims for want of jurisdiction, where the action was one for refund involving tax claims for separate years, in no one of which the claim for refund exceeded $10,000 but where the aggregate of the claims for the several tax years involved exceeded $10,000. In the case at bar, the amended complaint seeks recovery on 74 separate and distinct claims for freight alleged to be due on separate and independent shipments, each separate claim being for an amount less than $10,000 although the aggregate of the claims involves in the neighborhood of a quarter of a million dollars.

Rule 18(a) of the Federal Rules of Civil Procedure permits a suitor to join, either as independent or as alternate claims, as many claims, either legal or equitable, as he may have against an opposite party. The Federal Rules of Civil Procedure have been held applicable to an action brought under the Tucker Act to recover freight charges payable by the terms of a charter party. Eastern Transportation Co. v. United States of America, 2 Cir., 159 F.2d 349.

Inasmuch as none of the 74 separate claims of the plaintiff in the case at bar involves as much as $10,000, we think the District Court has jurisdiction under the Tucker Act to entertain all the claims, although they are consolidated in one suit. Certainly, it would have been burdensome upon the Court had the plaintiff elected to bring 74 separate suits, one on each claim, which it would have had the right to do. The District Court's jurisdiction should not be defeated as a result of the plaintiff's pursuit of the wise, common-sense course adopted by it. Rule 18(a) would seem to

justify the course pursued by the plaintiff in the instant case; and the Tucker Act is not considered to be preventive, inasmuch as no one claim in suit involves as much as $10,000.

■ (2) The second ground of the motion to dismiss is based upon the proposition that this District Court is without jurisdiction over the subject matter of the litigation until the Interstate Commerce Commission has passed upon the case, because the controversy is alleged to raise a question requiring the exercise of administrative expertness in determining whether the railroads are common carriers of products composed partly of silver. The Government cites the following cases in support of its contention: Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255; Great Northern Railway Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Baltimore & Ohio R. Co. v. U. S. ex rel. Pitcairn Coal Co., 215 U.S. 481, 30 S.Ct. 164, 54 L.Ed. 292; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S. Ct. 916, 57 L.Ed. 1472; Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446; Director General v. Viscose Co., 254 U.S. 498, 41 S. Ct. 151, 65 L.Ed. 372; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 57 L.Ed. 553; St Louis-Brownsville & Mexico Ry. Co. v. Brownsville Navigation District, 304 U.S. 295, 58 S.Ct. 868, 82 L.Ed. 1357; Eastern-Central Motor Carriers Ass'n v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; Norge Corporation v. Long Island R. Co., 2 Cir., 77 F.2d 312; Armour & Co. v. Alton R. Co., 7 Cir., 111 F.2d 913; Kelly v. Union Stock Yards, 7 Cir., 190 F.2d 860.

The strongest case cited by the Government in support of its proposition is the first case on the foregoing list. There, the Supreme Court held—thirty-eight years ago—that whether crossties are, or are not, lumber and therefore within the tariffs filed for the latter is a question concerning which there is a great diversity of opinion among experts upon the subject and, therefore, the question should be determined in the first instance by the Interstate Commerce Commission. It was held that the trial court should have sustained the motion to dismiss for want of jurisdiction. Standing alone this authority might well be conclusive in defendant's favor on the question of jurisdiction raised by the Government attorney.

But in a later opinion of the Supreme Court—and yet an old one, promulgated in 1922—Mr. Justice Brandeis, writing for the unanimous Supreme Court in Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943, explained and differentiated the American Tie & Timber Co. case for the reason that, in the case before it, as was not the situation in the Tie & Timber Co. case, there were no evidential or ultimate facts in controversy and there was, therefore, no occasion for the exercise of administrative discretion, the task to be performed by the court being merely to determine the meaning of words in a tariff used in their ordinary sense and to apply that meaning to undisputed facts. No preliminary resort to the Interstate Commerce Commission was therefore necessary. At page 295 of 259 U.S., at page 479 of 42 S.Ct., in a characteristically comprehensive footnote, Mr. Justice Brandeis cited a long list of prior decisions of the Supreme Court, as well as decisions of the lower federal courts and the state courts, in which the jurisdiction of a trial court was sustained without preliminary resort to the Interstate Commerce Commission and wherein the question involved was solely one of construction of a tariff, or otherwise a question of law and not of administrative discretion. He cited also prior decisions of the Supreme Court in which the Court refused to take jurisdiction because there had not been preliminary resort to the Commission, the questions presented being either questions of fact or questions involving the exercise of administrative discretion. The eminent Justice found no conflict in the authorities when the true distinctions pointed out by him were borne in mind. He said that "every question of the construction of a

tariff is deemed a question of law; and where the question concerns an interstate tariff it is one of federal law." He continued: "Hence, the attainment of uniformity does not require that in every case where the construction of a tariff is in dispute, there shall be a preliminary resort to the Commission." The opinion declared, 259 U.S. 291, 42 S.Ct. 479: "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the inquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts. *But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.*" (Emphasis supplied.)

The opinion points out further that when the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law; and that it is only where extrinsic evidence may be necessary to determine the meaning of technical words or phrases not commonly understood that the function of construction is necessarily preceded by the determination of the issue of fact. It was said that the only matter really in issue in the American Tie & Timber Co. case, supra, was whether the word "lumber" had been used in the tariff in a peculiar sense.

In the case at bar, the determination of whether a railroad had been made a common carrier of products composed partly of silver would seem to present only a question of law, determinable by the Court by construction of the pertinent rule and tariff classification.

The Court of Appeals for this Sixth Circuit has held pointedly in conformity with the Great Northern Ry. Co. opinion, supra, that the construction of railroad freight tariffs is a question of law and that the decisions of the Interstate Commerce Commission thereon, though carrying weight, are not binding on the federal courts. W. P. Brown & Sons Lumber Co. v. Louisville & N. R. Co., 6 Cir., 82 F.2d 94, 95.

The Court of Appeals for the Fifth Circuit held, in American Ry. Express Co. v. Price Bros., 5 Cir., 54 F.2d 67, that small onions having part of growing foliage on them when shipped were subject to a published tariff rate on "onions, green", rather than to the higher rate for "plants, strawberry and vegetable". The opinion directed attention to the fact that common knowledge of a green onion is so general and complete, it being an immature onion in a state of growth of any size and useful either to be eaten or planted for further growth, that resort to the dictionary seemed superfluous. Nevertheless, the dictionary was cited to support the Court's interpretation. It was held that the question presented was not exclusively for the Interstate Commerce Commission, but was a judicial question "which the courts may handle in the first instance." The opinion of the Supreme Court in the Great Northern Ry. case, supra, was cited as authority.

In Pennsylvania R. Co. v. Fox & London, Inc., 2 Cir., 93 F.2d 669, 670, the shipper contended, as does the United States here, that the meaning of a published tariff would have to be construed by the Interstate Commerce Commission before resort

1004

could be had to the courts. The argument was rejected, the Court stating that where the terms of a published tariff are unambiguous "the issue must be resolved by reference to the rate published, treating it as established law like any plain statute, leaving only the incidental issue of applicability which is dependent only upon the fact of the nature of the commodity shipped." The Court said further that no construction of a tariff was involved, where the only controversy was whether the commodity shipped is either of two things plainly classified.

Several District Court decisions, cited by the plaintiff, have applicability in support of its contention that the District Court has jurisdiction in the instant case. Alcoa S. S. Co., Inc. v. United States, D.C., 80 F.Supp. 158; Powell v. United States, D.C., 60 F.Supp. 433; American President Lines, Ltd. v. United States, D.C., 75 F. Supp. 110.

The conclusion has been reached that the second ground of the motion of defendant to dismiss for lack of jurisdiction is also not well grounded in law.

Accordingly, an order will be entered overruling the motion of defendant to dismiss this action for lack of jurisdiction.

### Findings of Fact

No. 1. Plaintiff is a Kentucky corporation. This action seeks to recover balances alleged to be due on bills rendered against the defendant by plaintiff, as delivering carrier, for transportation charges on various shipments of freight consigned to defendant or its agents.

No. 2. The action is brought under the Tucker Act, Title 28 U.S.C., § 1346, and Title 28, §§ 2401(a) and 2402.

No. 3. The amounts sued for were deducted and withheld from plaintiff's bills against defendant, or were allowed by plaintiff, under protest, on account of alleged overpayment by defendant of charges on certain articles or appliances from Allis-Chalmers Manufacturing Company, Milwaukee (West Allis), Wisconsin, consigned to the defendant or its agents at Elza (now Oak Ridge), Tennessee, in the years 1943, 1944, and 1945, and described in the bills of

lading as "Electrical appliances", or "Electrical appliances with silver wiring", or "Electrical appliances as per AAR section 22, Quotation No. 100".

No. 4. Said shipments were received at West Allis, Wisconsin, by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company and the Chicago & Northwestern Railway Company as initial carriers, and were variously routed, being delivered to defendant or its agents at destination by plaintiff.

No. 5. A representative of Allis-Chalmers Manufacturing Company consulted the operating department representatives of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company in respect to cars for the transportation of these appliances, and representatives of the rate department in respect to rates covering their transportation. The representatives of the carrier were advised that silver had been used in the manufacture of these appliances.

No. 6. The War Department was advised that the Illinois Freight Association was proposing the publication of a rate on five-day notice, under the description of "Electrical Appliances, Item 6120, Exceptions to Southern Classification No. 90."

No. 7. When this proposal was placed before the appropriate committee of the Association of American Railroads, it advised the representative of the War Department that railroads were not common carriers of silver in any form and that the proposed rate could not be published in a tariff, but would be authorized by a Section 22 (Interstate Com. Act) Quotation.

No. 8. Association of American Railroads issued Section 22 Quotation No. 100 authorizing transportation of these appliances described as electrical appliances, with silver wiring, not boxed or crated, from Milwaukee, Wisconsin, to Elza (now Oak Ridge), Tennessee, specifying a rate of $1.18 per cwt., with specified routing, said rate not to be subject to or reduced by any land-grant deduction. This quotation provided for the release of the railroads from liability in excess of the value of electrical appliances when copper wiring is used. A number of amendments were issued to this

Quotation, without changing the transportation rate named in the original Quotation.

No. 9. These appliances were of original manufacture and, for security reasons, their exact nature and content were not disclosed to the carriers at the time of shipment.

No. 10. Some 600 cars loaded with these appliances were transported from Milwaukee (West Allis), Wisconsin, to Elza (now Oak Ridge), Tennessee, by the plaintiff and its connections on bills of lading prepared by Allis-Chalmers Manufacturing Company, in which the appliances were described as "Electrical appliances", "Electrical appliances with Silver Wiring", "Electrical appliances as per AAR Section 22 Quotation No. 100", or "Electrical appliances with Electrical Wiring", and delivered to the defendant or its representative at Elza, Tennessee.

No. 11. Because of the dimensions of these appliances and the shortage of standard well cars it was necessary to change the floors of cars on which some of these shipments were transported and these cars were specially assigned to the movement of such appliances. The United States paid for all these modifications. Numerous shipments were made in standard cars, but it was necessary to give a few shipments special routing to clear tunnels. Certain shipments of the appliances of the same dimensions, however, were shipped over usual routes.

No. 12. The defendant contends that the correct rate for this transportation service is not more than $1.01 per cwt., less land-grant allowance, basing its contention upon Item 6120 of exceptions to Southern Classification, as shown in Section 7 of Illinois Freight Association Tariff Bureau, Freight Tariff No. 90, effective April 1, 1942, which provides for Class 55 rating on carload shipments of electrical appliances, as enumerated therein, minimum weight of 30,000 pounds, and the difference between the rate of $1.01, less land-grant allowance, based on the class 55 rating and the rate of $1.18 per cwt., named in Section 22 Quotation No. 100 has been deducted from plaintiff's current transportation bills by the defendant, or allowed by plaintiff under protest.

No. 13. Plaintiff and other carriers participating in the transportation of these appliances were parties to Consolidated Freight Classification in effect at the time the transportation services were performed. This classification was on file with the Interstate Commerce Commission. Rule 3 provides as follows:

"Unless otherwise provided in this Classification, the following property will not be accepted for shipment nor as premiums accompanying other articles:

"Bank bills, coin or currency, deeds, drafts, notes or valuable papers of any kind; jewelry; postage stamps or letters and packets of letters with or without postage stamps affixed; precious metals or articles manufactured therefrom; precious stones; revenue stamps; antiques; or other related or unrelated old, rare, or precious articles of extraordinary value."

Item No. 32495 of said classification provides as follows:

"Silver articles or ware, sterling, including articles with sterling silver parts, such as covers, backs, frames, handles or tops, but not including articles with small silver ornaments. Not taken."

No. 14. These appliances were of four different types. Type 1 weighed 33,750 pounds, of which 19,869 pounds or 58.87% was silver; type 2 weighed 56,300 pounds, of which 39,828 pounds or 70.74% was silver; type 3 weighed 56,100 pounds, of which 34,426 or 61.37% was silver; type 4 weighed 73,440 pounds, of which 25,890 pounds or 35.25% was silver. This silver had been withdrawn from the United States Treasury and was in the form of bars or ribbons, some 3¼ inches in width and 5/16 of an inch in thickness. There is no evidence of the number of each type of appliance shipped.

No. 15. Illinois Freight Association Tariff Bureau Freight Tariff No. 90, section 7, Exceptions to Southern Classification, contains Item 6120 which provides, in part, as

follows: "Electrical Appliances: * * * Electrical Appliances or Instruments N. O. I. B. N. in Southern Classification, in cartons, in bags, or in barrels, boxes or crates: * * * C. L., minimum weight 30,000 pounds ................ (Class) 55."

No. 16. In greater detail than has been asserted in Findings Nos. 5, 6, 7, 8 and 9, it is found that the General Traffic Manager of Allis-Chalmers Company, manufacturer of the articles herein involved, who took the position that there was no applicable tariff rate covering the manufactured articles, notified by letter the office of Chief of Transportation, War Department, that these shipments were about to be made and that there was no rate or classification in effect, but that a rate could be established on short notice under Section 22 of the Interstate Commerce Commission Act. The General Traffic Manager of the manufacturer, in negotiating with the initial carrier, called attention to the fact that his company had never before manufactured articles of the character involved, which contained a large proportion of silver. The Association of American Railroads, established to handle rate matters with the War Department among other governmental agencies, being brought into the matter, notified the Chief of Traffic Control Division of the War Department that the rate for the shipment of the articles must be by Section 22 Quotation, and not by tariff. In accordance with this notification, Section 22 Quotation No. 100, declaring a rate of $1.18 per cwt., was issued and mailed to the appropriate officer of the War Department, who acknowledged its receipt.

No. 17. The transportation of the articles involved herein necessitated the withdrawal from normal service by the initial carrier of 35 of its railroad cars, their assignment to the exclusive shipment of the articles involved, and the return, without revenue, of the empty cars from Oak Ridge, Tennessee, to West Allis, Wisconsin. It was shown by the evidence that the floors of these cars had to be removed and replaced by steel pockets which were lower than the original floors. There was also proof that extraordinary measures were necessarily taken by the carriers to protect the shipments against sabotage and to assure safe transportation; and that car inspectors were required to make frequent inspections and to remain on duty day and night to prevent delay in the shipments.

### Conclusions of Law

#### I

There was no applicable tariff rate covering the transportation of articles involved in this litigation.

#### II

The shipments did not, as is contended by the Government, fall within the tariff provided for "Electrical Appliances, N. O. I. B. N.", (Not otherwise indexed by name), Item No. 6120 I. F. A., Tariff No. 90, Exceptions to Southern Classifications. Inasmuch as the articles involved, as is shown by the evidence, contained some 35 to 70 per cent. of silver in their total weight (some of the articles weighing more than 70,000 pounds), Rule 3 of the Consolidated Freight Classification on file with the Interstate Commerce Commission, which has been quoted in Finding of Fact No. 13, is applicable and did not require the railroads to accept the articles as common carriers. Silver has always been and is now, in common acceptation and in ordinary meaning, a "precious metal". The articles in controversy were manufactured of silver to a large extent. As is well known, even silver coins issued by the United States as money do not consist entirely of silver. Since the railroads were not made common carriers of silver, it follows that there was no published tariff rate applicable to the transportation of the articles, consisting in heavy proportion of silver, involved herein. It is considered, however, that Item 32495 of the Consolidated Freight Classification is not applicable, inasmuch as this item is regarded as relating to different and smaller types of silver articles than the large silver bars or silver ribbons manufactured into the appliances herein involved. The argument of the Government that Rule 3 would apply only to an article manufactured entirely of silver is deemed obviously unsound.

## III

The Government contends that the decision of the Interstate Commerce Commission in the Silver Plated Iron or Steel Bearings case, Investigation and Suspension Docket No. 5297, 259 I.C.C. 360, supports its position on the merits of the case. The decision, if directly applicable, would carry great weight but would not be binding upon this court. W. P. Brown & Sons Lumber Co. v. Louisville & Nashville Railroad Co., 6 Cir., 82 F.2d 94. But the Interstate Commerce Commission authority is clearly distinguishable, for the reason that the silver content of the bearings, plated with silver, was only a small percentage of the weight and value of the bearings; while, in the instant case, the articles involved consisted of silver to the extent of 35 to 70 per cent. of their total weight. Moreover, in the cited authority, the railroads were not applying for authorization of a rate on bearings containing silver, but were proposing to restrict the ratings in a certain classification so as not to apply to bearings plated with silver or silver and lead, and to provide a higher rate on bearings plated with those materials.

## IV

The plaintiff stresses the decision of the Interstate Commerce Commission in Emporium v. New York Central Railroad Co., No. 26957, 214 I.C.C. 153, in which the Interstate Commerce Commission upheld the action of the railroad carriers as not in violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., in refusing to accept for transportation silverware (sterling) and goldware, and to establish rates thereon from San Francisco to New York. While it has been held here that Item 32495 of the Consolidated Freight Classifications does not apply, Rule 3 has been held applicable. The decision of the Interstate Commerce Commission in the Emporium case is, nevertheless, in point in support of the conclusion which has been reached.

## V

The argument of the Government that Section 22 of the Interstate Commerce Act does not authorize any contracts with the United States except for transportation either free or at reduced rates overlooks the language of the statute. The provision in Section 22(1) is that "nothing in this chapter shall *prevent* the carriage, storage, or handling of property free or at reduced rates for the United States * * * etc." (Emphasis supplied). This language does not forbid the authorization of a contract with the United States for transportation, either free or at reduced rates, but merely permits the carriers to transport property for the United States either free or at reduced rates.

In Nashville, Chattanooga & St. Louis Ry. v. State of Tennessee, 262 U.S. 318, 43 S.Ct. 583, 67 L.Ed. 999, the Supreme Court held that Section 22 of the Act to Regulate Commerce, as amended, in declaring that nothing in the Act shall prevent the transportation of property free or at reduced rate for the United States, and state or municipal governments, does not deny to the Interstate Commerce Commission power to prohibit such reduced rates when resulting in unjust discrimination or undue prejudice to interstate commerce. Mr. Justice Brandeis said: "The object of the section was to settle, beyond doubt, that the preferential treatment of certain classes of shippers and travelers, in the matters therein recited is not necessarily prohibited. And in this respect, its provisions are illustrative, not exclusive. It limits, or defines, the requirement of equality in treatment which is imposed in other sections of the act. By so doing, it preserves the right of the carrier theretofore enjoyed of granting, in its discretion, preferential treatment to particular classes in certain cases. Only in this sense can it be said that the section is permissive. It confers no right upon any shipper or traveler. Nor does it confer any new right upon the carrier." 262 U.S. 323, 43 S.Ct. 585. The opinion then points out that the grant of a lower rate on road material to a government, engaged in highway construction, may benefit the government without prejudicing any person, locality or class of traffic, but a lower rate may result to give a single quarry within the state all governmental business so that competing quarries and localities within or without the state,

1008

or interstate traffic, would be prejudiced. The Supreme Court upheld the ruling of the Interstate Commerce Commission that undue discrimination resulted from an order of the Railroad and Public Utilities Commission of Tennessee. In a footnote 262 U.S. at page 324 of the opinion, 43 S. Ct. 583, the Supreme Court cited rulings of the Interstate Commerce Commission construing Section 22 as conferring upon carriers *permission* to furnish transportation free, or at reduced rates in certain cases.

## VI

The Government urges that, apart from arrangements for reduced rates under Section 22, special tariffs applicable only to Government transportation are not authorized. Southern Pac. Co. v. United States, 272 U.S. 445, 447, 47 S.Ct. 123, 71 L.Ed. 343, is cited as authority. The case involved shipments of military impedimenta by the War Department by expedited service over a railroad which was bound by land-grant acts to transport property of the United States "at rates not exceeding 50 per cent. of those paid by private shippers for the same kind of service." The railroad company had no tariff for such service available to the public at large, but had filed with the Interstate Commerce Commission a special tariff for the Government, in such cases, without land-grant deductions. It was held that no contract of the United States to pay the special tariff rate could be implied from the fact that the shipments were made when the special tariff was the only one applicable on file, in the absence of proof that the contracting officers then knew of that tariff. It was considered further that the special tariff was filed without statutory authority and, therefore, the officers were not chargeable as a matter of law with knowledge of it. Mr. Justice Stone said: "A basis for a contract implied in fact to pay the rate charged is therefore wanting. *In this respect the case differs from those in which a recovery was allowed where there was no lawful tariff and the shipments were made with knowledge on the part of the government representatives of the rates published by the carrier.*" 272 U.S. 447, 47 S.Ct. 124. (Italics supplied.) The itali-

cized sentence of the Court's opinion points to the difference between the Southern Pacific case and the case at bar, for here the Government representatives were apprised of the rate promulgated by the carrier for transportation of the articles shipped. The italicized statement of Mr. Justice Stone would seem to indicate plainly that, in the situation encountered here, the Government is bound to pay the rate promulgated by the carrier for shipment of the articles involved, inasmuch as the appropriate officers of the United States Government had direct knowledge of the freight rate which the carrier expected to be paid.

## VII

██ It is quite well settled that a common carrier, when acting outside of the performance of its required legal duties to transport goods which it is not required to carry, is privileged to enter into a contract as a private carrier. See for example Mc-Cree v. Davis, 6 Cir., 280 F. 959; Sasinowski v. Boston & Maine R. Co., 1 Cir., 74 F.2d 628. In view of the facts found as stated in Finding 17, the extra services—not normally given by the carriers—justified a special rate, if lawful and not unreasonable or excessive. We have concluded from the facts of record that the rate of $1.18 per cwt. fixed by the American Association of Railroads (Section 22 Quotation 100) was a lawful rate, not subject to land-grant reduction, and was binding upon the defendant in respect of the shipments involved in this case, inasmuch as, in the judgment of this Court, there was no published tariff rate applicable to the articles shipped; and Rule 3 did not require the carriers to accept articles manufactured from precious metals, within which description would be classified the articles composed of 35 to 70 per cent. of silver with which we are concerned.

## VIII

██ Interstate Commerce Section 22 Quotation 100, issued by the Association of American Railroads, as agent of the carriers handling the shipments involved, was in effect accepted as an implied contract rate by the United States when it caused the articles involved herein to be shipped.

## IX

A judgment drawn in conformity with the conclusions of law ·herein expressed will be prepared by plaintiff's attorney, submitted to defendant's attorney. for approval as to form and as to the correctness of the amount due the plaintiff on each of the numerous counts of the complaint and amended complaint on the basis of this Court's decision; and, when so prepared and approved, such judgment will be submitted to the Court for entry.